



**FILED**

Jan 20 2026, 8:54 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

# IN THE
# Court of Appeals of Indiana

State of Indiana ex rel. Theodore E. Rokita, Attorney General of Indiana,

*Appellant-Plaintiff*

v.

William J. Pfister, Estate of Richard A. Sopko, Travelers Insurance Companies, Western Surety Insurance Company, Westfield Companies, and Ohio Farmers Insurance Company,

*Appellees-Defendants*

---

January 20, 2026

Court of Appeals Case No.
25A-PL-614

Appeal from the Lake Circuit Court

The Honorable Marissa McDermott, Judge

Trial Court Cause No.
45C01-1705-PL-51

**Opinion by Judge Vaidik**
Judges Bailey and DeBoer concur.

**Vaidik, Judge.**

# Case Summary

[1] This appeal concerns events that occurred from 1999 to 2014 when William J. Pfister was the Superintendent and Richard A. Sopko (now deceased) was the Assistant Superintendent for the School Town of Munster. In 2016, the Indiana State Board of Accounts (SBOA) issued a report stating that while Pfister and Sopko were officers, they received nearly $850,000 more than their contracts allowed in violation of the SBOA's uniform compliance guidelines. Most of the alleged overpayments were related to their annuities. That is, Pfister and Sopko claimed that provisions in their contracts providing that a percentage of their salaries was to be paid to an annuity each year (4% for Pfister and 3% for Sopko) allowed for yearly compounding of the percentages, ultimately resulting in 38% of Pfister's salary and 36% of Sopko's salary being paid to an annuity.

[2] In 2017, the Indiana Attorney General, on behalf of the State of Indiana, filed a complaint to recover public funds against Pfister and Sopko under Indiana Code section 5-11-5-1(a), alleging they had engaged in malfeasance, misfeasance, and/or nonfeasance and that public funds had been misappropriated, diverted, or unaccounted for. The trial court granted summary judgment for Pfister and Sopko. Specifically, the court found that Section 5-11-

5-1(a) didn't authorize the State's action against Pfister and Sopko and that, in any event, the language in their contracts was ambiguous as to whether compounding was allowed.

[3] We reverse the trial court's entry of summary judgment for Pfister and Sopko. In doing so, we find that Section 5-11-5-1(a) authorizes the State's action to recover public funds misappropriated, diverted, or unaccounted for as a result of malfeasance, misfeasance, or nonfeasance. We also find that the relevant provisions in Pfister's and Sopko's contracts are unambiguous and do not allow for compounding. In accordance with the State's request, we remand this case to the trial court for trial.

## Facts and Procedural History

### Superintendent Pfister's Contracts

[4] On July 1, 1999, the School Town entered into a Superintendent's Contract with Pfister. *See* S-J Ex. 1.[1] Each year for the next decade, the School Town and Pfister entered into a new contract. The contracts, which were approved by the school board, provided that they could not be "amended, changed or modified except upon written agreement executed by all parties." *See, e.g.*, *id.* Although each contract had a term of three years, the parties executed a new contract

---

[1] The State cites various pages in Appellant's Appendix Volume 17 as the locations of the various contracts at issue here. The contracts, however, are not located at those pages. As a result, we cite to each contract by the exhibit number it had below on summary judgment. *See* Motion and Memorandum in Support of Summary Judgment, Cause No. 45C01-1705-PL-51 (Oct. 13, 2023).

each year until Pfister's final contract, which was executed on February 1, 2009, and terminated on June 30, 2012, when he retired.

[5] In 2001, the following bolded language was added to Pfister's contract under Paragraph 10, labeled "Fringe Benefits":

> The School Corporation shall pay the Superintendent's annual contribution to the Indiana State Teachers Retirement Fund, **plus an additional 2% toward his Indiana Teacher Retirement Fund.**

S-J Ex. 3 (emphasis added). In 2002, the language was changed as follows:

> The School Corporation shall pay the Superintendent's annual contribution to the Indiana State Teachers Retirement Fund, plus **each year** an additional 2% toward **an annuity of his choice.**

S-J Ex. 4 (emphases added).[2] In 2003, the percentage increased to 4%:

> The School Corporation shall pay the Superintendent's annual contribution to the Indiana State Teachers Retirement Fund, plus each year an additional **4%** toward an annuity of his choice.

S-J Ex. 5 (emphasis added). This language remained the same for the rest of Pfister's contracts. *See* S-J Exs. 6-11.

---

[2] At oral argument, the State explained that the contract language changed from "an additional 2% toward his Indiana Teacher Retirement Fund [(TRF)]" to "an additional 2% toward an annuity of his choice" because of a state statute that restricts how much can be deposited into TRF accounts. *See* Oral Arg. at 7:45-8:21.

[6]     Pfister's contracts provided for other fringe benefits, including:

> **Cash Bonus**: "The administrator will receive a cash bonus in lieu of severance benefits as outlined in the Administrative Fringe Benefits, Section VI, 'Severance.'"[3]
>
> **Investment Allotment**: "The School Corporation will pay, on or before July 1 of each school year, twelve (12) percent[4] of the Superintendent's salary toward investments selected by the Superintendent."
>
> **Community Relations**: "The School Corporation shall pay the Superintendent $6,000.00 per calendar year for community relation activities as determined by the Superintendent."[5]

*See generally* S-J Exs. 1-11.

## Assistant Superintendent Sopko's Contracts

[7]     On July 1, 1998, the School Town entered into an Assistant Superintendent's Contract with Sopko. *See* S-J Ex. 12. Each year for the next 13 years, the School Town and Sopko entered into a new Assistant Superintendent's Contract. The contracts, which were approved by the school board, provided that they could not be "amended, changed, or modified except upon written agreement executed by all parties." *See, e.g.*, *id.* Although each contract had a term of three

---

[3] This provision first appeared in the 2000 contract.

[4] This amount was 9% in the 1999 and 2000 contracts and then increased to 12% in the 2001 contract.

[5] This provision first appeared in the 2001 contract.

years, the parties executed a new contract each year until Sopko's final Assistant Superintendent's Contract, which was executed on July 1, 2011, and terminated on June 30, 2012. On July 1, 2012, upon Pfister's retirement, Sopko became the Superintendent for the School Town, and he retired on June 30, 2014.[6]

[8] As with Pfister, in 2001, the following bolded language was added to Sopko's Assistant Superintendent's Contract under Paragraph 10 labeled "Fringe Benefits":

> The School Corporation shall pay the Assistant Superintendent's annual contribution to the Indiana State Teachers' Retirement Fund, **plus an additional 2% toward his Indiana Teacher Retirement Fund.**

S-J Ex. 15 (emphasis added). In 2002, the language was changed as follows:

> The School Corporation shall pay the Assistant Superintendent's annual contribution to the Indiana State Teachers' Retirement Fund, plus **each year** an additional 2% toward **an annuity of his choice.**

S-J Ex. 16 (emphases added). In 2003, the percentage increased to 3%:

> The School Corporation shall pay the Assistant Superintendent's annual contribution to the Indiana State Teachers' Retirement

---

[6] On July 1, 2012, the School Town entered into a Superintendent's Contract with Sopko, which terminated on June 30, 2014, when he retired. Sopko's Superintendent's Contract is not at issue.

Fund, plus each year an additional **3%** toward an annuity of his choice.

S-J Ex. 17 (emphasis added). This language remained the same for the rest of Sopko's contracts. *See* S-J Exs. 18-25.

[9] Also like Pfister, Sopko's contracts provided for other fringe benefits, including:

**Cash Bonus**: "The administrator will receive a cash bonus in lieu of severance benefits as outlined in the Administrative Fringe Benefits, Section VI, 'Severance.'"[7]

**Investment Allotment**: "The School Corporation will pay, on or before July 1 of each school year, five (5) percent of the Assistant Superintendent's salary toward investments selected by the Assistant Superintendent."[8]

**Community Relations**: "The School Corporation shall pay the Assistant Superintendent $4,000.00 per calendar year for community relation activities as determined by the Superintendent."[9]

*See generally* S-J Exs. 14-25.

---

[7] This provision first appeared in the 2000 contract.

[8] This provision first appeared in the 2000 contract.

[9] This provision first appeared in the 2001 contract.

### The Payment Process for the Annuity Payments

Each year, Sopko gave the School Town's deputy treasurer, Janice Swanson, the precise formula by which the annuity payments for him and Pfister were to be calculated. *See* Appellant's App. Vol. 13 p. 209. Swanson then created an Accounts Payable Voucher for the annuity payments, which she signed certifying that it was "true and correct" and that she had audited it in accordance with Indiana Code section 5-11-10-1.6. *See, e.g.*, Appellant's App. Vol. 8 p. 82. The vouchers were sent to the school board for approval as part of an Accounts Payable Voucher Register, which ranged from 43 to 72 pages.

### The SBOA Gets Involved and Issues Report

In 2015, after Pfister's and Sopko's retirements, the School Town's attorney contacted the SBOA about "suspected misappropriation" of School Town funds by Pfister and Sopko. Appellant's App. Vol. 7 p. 189. The SBOA conducted an examination under Indiana Code section 5-11-1-9(a), which provides that it "shall examine all accounts and all financial affairs of every audited entity." In June 2016, the SBOA issued Special Investigation Report B46414, which addressed the salary and benefits paid to Pfister and Sopko from July 1, 1999, to June 30, 2014. The report found that while Pfister and Sopko were officers for the School Town, they each received hundreds of thousands of dollars more than their contractual entitlements.

As to Pfister, the Special Investigation Report identified $359,728.94 in overpayments to his annuity:

| School Year/Contract Year | Annuity Percentage Per Contract | Annuity Percentage Actually Paid | Salary Amount Per Contract | Annuity Amount Calculated Per Contract | Annuity Amount Actually Paid | Amount Overpaid |
|---|---|---|---|---|---|---|
| 2011-2012 | 4% | 38% | $ 178,101.00 | $ 7,124.04 | $ 74,802.00 | $ 67,677.96 |
| 2010-2011 | 4% | 34% | 177,501.00 | 7,100.04 | 67,450.00 | 60,349.96 |
| 2009-2010 | 4% | 30% | 180,726.00 | 7,229.04 | 62,182.00 | 54,952.96 |
| 2008-2009 | 4% | 26% | 175,815.00 | 7,032.60 | 53,389.00 | 46,356.40 |
| 2007-2008 | 4% | 22% | 171,030.00 | 6,841.20 | 44,917.00 | 38,075.80 |
| 2006-2007 | 4% | 18% | 164,440.00 | 6,577.60 | 36,177.00 | 29,599.40 |
| 2005-2006 | 4% | 14% | 161,921.00 | 6,476.84 | 29,491.00 | 23,014.16 |
| 2004-2005 | 4% | 10% | 157,538.00 | 6,301.52 | 22,266.00 | 15,964.48 |
| 2003-2004 | 4% | 6% | 153,265.00 | 6,130.60 | 15,327.00 | 9,196.40 |
| 2002-2003 | 2% | 2% | 149,100.00 | 2,982.00 | 17,354.96 | 14,372.96 |
| 2001-2002 | 2% | 2% | 141,577.00 | 2,831.54 | 3,000.00 | 168.46 |
| Totals | | | | $ 66,627.02 | $ 426,355.96 | $ 359,728.94 |

Appellant's App. Vol. 2 p. 95. As the chart shows, instead of Pfister getting 4% of his salary paid into an annuity each year, the percentages were compounded. As a result, for the 2011-12 school year, 38% of Pfister's salary—$74,802—was paid into an annuity. The report showed that Pfister was overpaid in other areas as well: (1) Cash Bonus In Lieu of Severance, $27,222.50; (2) Investment Allotment, $50,351.13; (3) Salaries and Stipends, $24,620.18; and (4) Community Relations Activities, $2,000. *Id.* at 97, 99, 101, 103.

[13] As to Sopko, the Special Investigation Report identified $311,196.75 in overpayments to his annuity:

| School Year/Contract Year | Annuity Percentage Per Contract | Annuity Percentage Actually Paid | Salary Amount Per Contract | Annuity Amount Calculated Per Contract | Annuity Amount Actually Paid | Amount Overpaid |
|---|---|---|---|---|---|---|
| 2012-2013 | 0% | 36% | $ 155,243.00 | $ - | $ 55,887.00 | $ 55,887.00 |
| 2011-2012 | 3% | 33% | 154,643.00 | 4,639.29 | 51,032.00 | 46,392.71 |
| 2010-2011 | 3% | 30% | 152,619.00 | 4,578.57 | 45,786.00 | 41,207.43 |
| 2009-2010 | 3% | 27% | 155,077.00 | 4,652.31 | 42,338.00 | 37,685.69 |
| 2008-2009 | 3% | 24% | 151,069.00 | 4,532.07 | 36,659.00 | 32,126.93 |
| 2007-2008 | 3% | 21% | 147,161.00 | 4,414.83 | 31,246.00 | 26,831.17 |
| 2006-2007 | 3% | 18% | 137,766.00 | 4,132.98 | 24,798.00 | 20,665.02 |
| 2005-2006 | 3% | 15% | 135,629.00 | 4,068.87 | 20,575.00 | 16,506.13 |
| 2004-2005 | 3% | 12% | 130,740.00 | 3,922.20 | 15,865.00 | 11,942.80 |
| 2003-2004 | 3% | 11% | 125,237.00 | 3,757.11 | 13,794.00 | 10,036.89 |
| 2002-2003 | 2% | 11% | 121,819.00 | 2,436.38 | 14,233.04 | 11,796.66 |
| 2001-2002 | 2% | 2% | 116,484.00 | 2,329.68 | 2,450.00 | 120.32 |
| Totals | | | | $ 43,464.29 | $ 354,663.04 | $ 311,198.75 |

*Id.* at 96. As the chart shows, instead of Sopko getting 3% of his salary paid into an annuity each year, the percentages were compounded. As a result, for the 2012-13 school year, 36% of Sopko's salary—$55,887—was paid into an annuity. The report similarly identified that Sopko was overpaid in other areas: (1) Cash Bonus In Lieu of Severance, $20,365.77; (2) Investment Allotment, $33,204.78; (3) Salaries and Stipends, $12,255.98; and (4) Community Relations Activities, $450. *Id.* at 98, 100, 102, 103.

[14] For each category of overpayment, the Special Investigation Report set forth the provisions from the SBOA's Accounting and Uniform Compliance Guidelines Manual for Indiana Public School Corporations that it alleged were violated. For example, for the overpayments to Pfister's and Sopko's annuities, the report alleged the following violations:

> Each governmental unit is responsible for complying with the provisions of its contracts. (Accounting and Uniform Compliance Guidelines Manual for Indiana Public School Corporations, Chapter 9)

> Every effort should be made by the governmental unit to avoid unreasonable or excessive costs. (Accounting and Uniform Compliance Guidelines Manual for Indiana Public School Corporation, Chapter 9)

> All compensation and benefits paid to officials and employees must be included in the labor contract, salary ordinance, resolution or salary schedule adopted by the governing body unless otherwise authorized by statute. Compensation should be made in a manner that will facilitate compliance with state and federal reporting requirements. (Accounting and Uniform

Compliance Guidelines Manual for Indiana Public School Corporations, Chapter 13)

Funds misappropriated, diverted or unaccounted for through malfeasance, misfeasance, or nonfeasance in office of any officer or employee may be the personal obligation of the responsible officer or employee. (Accounting and Uniform Compliance Guidelines Manual for Indiana Public School Corporations, Chapter 9)

*Id.* at 95-97.

[15] The SBOA requested that Pfister and Sopko reimburse the School Town $463,922.75 and $377,475.28, respectively, plus audit costs of $10,053.32. It also sent a signed and verified copy of the Special Investigation Report to the Office of the Indiana Attorney General.

**The Attorney General Files Complaint**

[16] In May 2017, the Attorney General, on behalf of the State of Indiana, filed a Complaint to Recover Public Funds under Indiana Code section 5-11-5-1(a) against Pfister, Sopko (who passed away in 2022 and was substituted by his estate), and several companies that had issued insurance policies and bonds covering Pfister and/or Sopko's conduct, including Travelers Insurance Companies and Ohio Farmers Insurance Company.[10] The complaint, which included the Special Investigation Report as an attachment, alleged that the

[10] The State also sued Western Surety Insurance Company and Westfield Companies, but the State's claims against those companies are not at issue in this appeal. *See* Appellant's App. Vol. 2 p. 40.

report disclosed "malfeasance, misfeasance, and/or nonfeasance on the part of Pfister and Sopko." *Id.* at 73; *see* Ind. Code § 5-11-6-1(h) (providing that the report is "prima facie evidence of the facts stated and contained" therein). The complaint also alleged that public funds were either "a. misappropriated, diverted, or unaccounted; b. illegally received; c. illegally retained; d. unaccountable for or not paid over any money so received; e. obtained by fraud or in any unlawful manner; and/or f. wrongfully withheld from the public treasury." Appellant's App. Vol. 2 p. 73.

[17] As to the overpayments to Pfister's annuity, the complaint alleged:

> 17. Each year from June 27, 2003 through June 30, 2012, Pfister entered into Superintendent Contracts with the School Town, each of which included, at Pfister's direction, an Annuity Starter Clause providing for a Payment of 4% of Pfister's salary to an annuity of his choice.

> 18. During the Audit Period, Pfister **deviated from the plain reading of his Superintendent Contracts** in order to receive an annual annuity payment each year in excess of the Annuity Starter Clause, to which he was not entitled based upon the Superintendent Contracts approved by the School Town Board, and **without the School Town Board's knowledge**.

> 19. Pfister's Annuity Starter percentage compounded to the point that by 2011 to 2012, he was receiving an extra annuity starter contribution of 38% of his salary, **without any knowledge or approval by the School Town Board.**

> 20. From 2001 to 2012, Pfister was wrongfully paid over and above his contracted Annuity Starter in the total amount of

$359,728.94, beyond that to which he was entitled by the terms of his Superintendent Contracts.

*Id.* at 75 (emphases added). Consistent with the Special Investigation Report, the complaint also alleged overpayments to Pfister of $27,222.50 for cash bonuses, $50,351.13 for investment allotments, $24,620.18 for salaries and stipends, and $2,000 for community-relations activities, for a total of $463,922.75 plus audit costs, court costs, and attorney's fees.

[18] As to the overpayments to Sopko's annuity, the complaint alleged:

41. Each year from June 27, 2003 through June 30, 2012, Sopko entered into Assistant Superintendent Contracts with the School Town, each of which included, at Sopko's direction, an Annuity Starter Clause providing for a payment of 3% of Sopko's salary to an annuity of his choice.

42. During the Audit Period, Sopko **deviated from the plain reading of his Assistant Superintendent Contracts** in order to receive an annual annuity payment each year in excess of the Annuity Starter Clause, to which he was not entitled based upon the Assistant Superintendent Contracts approved by the School Town Board, and **without the School Town Board's knowledge.**

43. From 2001 to 2012, Sopko was wrongfully paid over and above his contracted Annuity Starter in the total amount of $311,198.75, beyond that to which he was entitled by the terms of his Assistant Superintendent Contracts.

*Id.* at 78-79 (emphases added). Consistent with the Special Investigation Report, the complaint also alleged overpayments to Sopko of $20,365.77 for cash

bonuses, $33,204.78 for investment allotments, $12,255.98 for salaries and stipends, and $450 for community-relations activities, for a total of $377,475.28 plus audit costs, court costs, and attorney's fees.[11]

[19] As to Travelers, the State sought to recover $87,733.48 under two public-dishonesty bonds and $100,000 under two crime-insurance policies. *See id.* at 83-84. As to Ohio Farmers, the State sought $130,156.10 under five public-official bonds. *See id.* at 88-89.

**The Parties Seek and Obtain Summary Judgment[12]**

[20] In October 2022, Pfister and Sopko moved for partial summary judgment on the issue of overpayments to their annuities. Specifically, they asked the trial court to "grant summary judgment in their favor regarding the State's assertion that they 'deviated' from the 'plain reading' of Paragraph 10 of their administrator employment contracts." Appellant's App. Vol. 8 p. 187.

---

[11] The State also brought claims against Pfister and Sopko for treble damages under the Crime Victims Relief Act, Indiana Code section 34-24-3-1. The trial court entered summary judgment on those counts for Pfister and Sopko, and the State is not appealing that part of the judgment. *See* Appellant's Br. p. 13 n.1.

[12] In 2018, the trial court entered partial summary judgment for Pfister and Sopko on statute-of-limitations grounds. On appeal, this Court affirmed, holding that "the causes of action brought against Pfister and Sopko for amounts paid before May 23, 2012, five years prior to the May 23, 2017 complaint filed by the State, are barred by the statute of limitations." *State ex rel. Hill v. Pfister*, No. 18A-PL-771, 2019 WL 2571877 (Ind. Ct. App. June 24, 2019) (mem.), *trans. granted*. In 2020, the Indiana Supreme Court ruled in *Robertson v. State* that the statute of limitations for actions under Section 5-11-5-1(a) doesn't begin to run until the Attorney General receives the final report from the SBOA. 141 N.E.3d 1224, 1228 (Ind. 2020). The Supreme Court then granted transfer in No. 18A-PL-771, vacated the opinion, and remanded the case to the trial court for reconsideration in light of *Robertson*. *See State ex rel. Hill v. Pfister*, 141 N.E.3d 1220 (Ind. 2020). There is no longer a statute-of-limitations issue under Section 5-11-5-1(a) in this case.

After a hearing, the trial court entered an order in July 2023 granting partial summary judgment to Pfister and Sopko on the issue of overpayments to their annuities. Specifically, the court found that the language in Paragraph 10 of the contracts was "subject to more than one interpretation" as to whether the percentages compounded from year to year and therefore was "ambiguous" on this point:

> They did not "deviate" from the "plain reading" of Paragraph 10 of their contracts, because there is no facial "plain reading" of the contracts. On that discrete issue, summary judgment is granted in Defendants' favor.

Appellant's App. Vol. 13 pp. 214, 217.

In October 2023, the State and Pfister and Sopko filed competing summary-judgment motions on the remaining issues. The State sought summary judgment on the alleged overpayments to Pfister and Sopko for cash bonuses, investment allotments, salaries and stipends, and community-relations activities as well as audit costs. *See* Appellant's App. Vol. 17 pp. 69-84. Pfister and Sopko sought summary judgment on the ground that Section 5-11-5-1(a) "is not a statute granting a stand-alone cause of action, but rather claims brought pursuant to the statute must contain an underlying, specific law that has been violated." Appellant's App. Vol. 13 p. 225. Travelers and Ohio Farmers, who joined Pfister and Sopko's motion for summary judgment on the merits, *see* Appellant's App. Vol. 19 p. 34, also moved for summary judgment on grounds

specific to the individual policies and bonds, *see* Appellant's App. Vol. 16 pp. 99 (Ohio Farmers), 149 (Travelers).

[23] At the summary-judgment hearing, the State argued that, at a minimum, Pfister and Sopko committed nonfeasance when they "fail[ed] to act upon notice of their . . . overpayment" once "the State Board of Accounts issued the audit report." Tr. pp. 47, 49; *see also* Appellant's App. Vol. 17 p. 69 ("Regardless of their intent, they each received funds in excess of what they were entitled to receive from contracts. As such, it is, at a minimum, an act of non-feasance to not return the funds once they were made aware of the overpayments."); Oral Arg. at 11:20, 13:31.

[24] In July 2024, the trial court entered an order granting Pfister and Sopko's motion and denying the State's motion. The court explained that "[c]ombined with this Court's prior Order on partial summary judgment, the effect is that the State's Complaint against the Defendants is hereby dismissed in its entirety." Appellant's App. Vol. 2 p. 47. First, the court explained:

> Regarding the various amounts that it continues to pursue, the State concedes that it does not allege intent on the part of either of the individual Defendants. Rather, the State's remaining claims are grounded solely in what it terms "nonfeasance," drawing from the language of I.C. § 5-11-5-1. Setting aside for a moment the issue of whether "nonfeasance" is actually a stand-alone cause of action at all, a notion that the Defendants have challenged and this Order addresses below, the State cites Indiana's Supreme Court as defining the term as "the omission of an act which a person ought to do[.]" The State also quotes from the online Merriam Webster dictionary, which similarly states

that "nonfeasance" is "failure to do what ought to be done." Here, the "act," i.e. what the Defendants "ought to" have done, the State argues, is to *affirmatively* ensure that they were not overpaid pursuant to their written employment contracts. No such burden exists in Indiana employment law, however, and all of the State's claims to claw back purported overpayments fail as a result.

. . . .

In sum, the State has not identified a source establishing the sole "duty" that it alleges the Defendants have violated, the duty "to ensure that they are not overpaid." On this basis, the State's motion for summary judgment is denied, and the Defendants' motion is granted. The State's remaining claims are extinguished.

Appellant's App. Vol. 2 pp. 55-56, 60 (citations and footnote omitted). The court acknowledged the State's argument that the SBOA's Accounting and Uniform Compliance Guidelines Manual for Indiana Public School Corporations established Pfister's and Sopko's duty to return the funds. However, it found that the manual was a "best practices" guide that did not constitute "legal authority." *Id.* at 58.

[25] The trial court identified two alternative grounds for granting summary judgment to Pfister and Sopko. First, the trial court found that Section 5-11-5-1 was "undoubtedly unconstitutionally vague" as applied to Pfister and Sopko because it is directed to "State agencies" and not "employees." *Id.* at 64-65. And second, the court found that the State could not recover amounts before March 2002 due to record-keeping issues and staff changes.

[26]    The trial court explained that it was denying the State's motion for summary judgment regarding the alleged overpayments to Pfister and Sopko for cash bonuses, investment allotments, salaries and stipends, and community-relations activities as well as audit costs because "[a]ny remaining factual disputes regarding whether the amounts did or did not constitute overpayments[] are rendered moot by this Order, as the State simply has not set forth any actionable ground for recovery of the amounts, regardless." *Id.* at 69.

[27]    As to the insurance and bond companies, the trial court granted summary judgment in full for Travelers "because there is no evidence of dishonest conduct" by Pfister and Sopko. *Id.* at 44. The court found that even if summary judgment was improper in full, Travelers' liability was limited based on the language of the policies and bonds. *See id.* at 45. The court also granted summary judgment in full for Ohio Farmers "because there is no evidence [Sopko] failed to faithfully perform his duties." *Id.* at 70. As it did with Travelers, the court found that even if summary judgment was improper in full, Ohio Farmers' liability was limited based on the language of the policies. *See id.* at 71 (noting that Ohio Farmers' maximum liability was $90,000).[13]

---

[13] In this appeal, Travelers and Ohio Farmers filed a notice of non-participation alleging that because the State's brief doesn't challenge the policy-specific portions of the trial court's summary-judgment orders, they do not "intend to participate on appeal or file a Brief of Appellee defending those two unchallenged Orders unless requested by this Court to do so." Notice of Non-Participation, No. 24S-PL-310 (Ind. Jan. 13, 2025); *see also* Acknowledgment of Oral Argument, No. 25A-PL-614 (Ind. Ct. App. Nov. 24, 2025) (Travelers and Ohio Farmers acknowledging oral argument but reaffirming that they are not participating on appeal).

**The State Appeals**

In August 2024, the State filed a Notice of Appeal, invoking the Indiana Supreme Court's mandatory and exclusive jurisdiction under Indiana Appellate Rule 4(A)(1)(b) on grounds that the trial court had declared Indiana Code section 5-11-5-1 unconstitutional. In March 2025, the Supreme Court issued an order that "the State has filed its appeal in the wrong court." *State v. Pfister*, No. 24S-PL-310 (Ind. Mar. 13, 2025). The Supreme Court explained that the trial court's order "extinguished the State's claims before reaching any constitutional analysis. At best, the trial court's analysis served as an alternative summary judgment basis." *Id.* Accordingly, the Supreme Court transferred the case to this Court.[14]

# Discussion and Decision

The State appeals the trial court's entry of summary judgment for Pfister, Sopko, Travelers, and Ohio Farmers. We review a motion for summary judgment de novo, applying the same standard as the trial court. *Hughley v. State*, 15 N.E.3d 1000, 1003 (Ind. 2014). That is, "The judgment sought shall be rendered forthwith if the designated evidentiary matter shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Ind. Trial Rule 56(C).

---

[14] We held oral argument on December 8, 2025. We thank counsel for their helpful presentations.

# I. Indiana Code section 5-11-5-1(a) authorizes the action here

[30]   The threshold issue in this case is whether Section 5-11-5-1(a) authorizes the Attorney General's action against Pfister and Sopko for the return of the alleged overpayments. This was addressed in the trial court's July 2024 summary-judgment order. Pfister and Sopko argue that the trial court properly entered summary judgment for them because the Attorney General cannot bring an action under Section 5-11-5-1(a) for violations of the SBOA's uniform compliance guidelines. Instead, they contend, the Attorney General can only bring an action to recover public funds for violations of statutes or an underlying cause of action, such as theft, conversion, or breach of contract, which the Attorney General didn't do here. To understand this issue, we start with the function of the SBOA and the relevant statutes.

[31]   The Indiana General Assembly created the SBOA in 1909. *See* Indiana State Board of Accounts, History, https://www.in.gov/sboa/about-us/history/ [https://perma.cc/Z87S-CHLY]. The SBOA is tasked with auditing Indiana units of government, including state agencies, counties, cities, towns, townships, schools, charter schools, universities, libraries, hospitals, and housing authorities. The SBOA has many duties, including (1) formulating, prescribing, and installing a system of accounting and reporting under Indiana Code section 5-11-1-2; (2) collecting annual financial reports from every audited entity under Indiana Code section 5-11-1-4; (3) formulating, prescribing, and approving the forms for reports under Indiana Code section 5-11-1-6; and (4) examining all accounts and financial affairs of every audited entity under

Indiana Code section 5-11-1-9. As relevant here, Indiana Code section 5-11-1-24 provides that the SBOA "shall establish in writing uniform compliance guidelines" that an audited entity "must observe":

> (a) The state board of accounts shall establish in writing uniform compliance guidelines for the examinations and reports required by this chapter. The uniform compliance guidelines must include the standards that an entity must observe to avoid a finding that is critical of the audited entity for a reason other than the audited entity's failure to comply with a specific law.
>
> . . . .
>
> (c) The state board of accounts must distribute the uniform compliance guidelines to each audited entity that the state board of accounts may audit.

These "uniform compliance guidelines," which are published on the SBOA's website, can be found in several documents: the Accounting and Uniform Compliance Guidelines Manuals, Bulletins, and State Examiner Directives. Notably, there are manuals, bulletins, and directives geared toward each audited entity. For public schools, the manual is called the Accounting and Uniform Compliance Guidelines Manual for Indiana Public School Corporations (hereinafter, "the Public School Manual"). *See* Indiana State Board of Accounts, Schools, https://www.in.gov/sboa/political-

subdivisions/schools [https://perma.cc/55YH-3D4P].[15] "All public officers and responsible officers of audited entities shall adopt and use the books, forms, records, and systems of accounting and reporting adopted by the state board of accounts, when directed so to do by the board[.]" I.C. § 5-11-1-21(a).

[32] Indiana Code section 5-11-5-1[16] governs examinations[17] conducted by the SBOA:

> (a) Whenever an examination is made under this article, a report of the examination shall be made. The report must include a list of findings and shall be signed and verified by the examiner making the examination. A finding that is critical of an examined entity must be based upon one (1) of the following:
>
> > **(1) Failure of the entity to observe a uniform compliance guideline established under IC 5-11-1-24(a).**
> >
> > (2) Failure of the entity to comply with a specific law.
>
> > **A report that includes a finding that is critical of an examined entity must designate the uniform compliance guideline** or the specific law **upon which the finding is based**. . . .

(Emphases added).

---

[15] The Public School Manual in Appellant's Appendix Volumes 18-19 appears to be the 2010 version.

[16] This statute has been amended through the years. Because the parties don't claim that any of the amendments impact this case, we cite the current version (2024).

[17] The SBOA examines school corporations every two years. *See* I.C. § 5-11-1-25(d).

[33] When the SBOA makes a finding that it is critical of an examined entity, it has options, such as issuing "confidential management letters." I.C. § 5-11-5-1(a). But when an examination discloses "malfeasance, misfeasance, or nonfeasance in office or of any officer or employee," the following procedure must be followed:

> If an examination discloses **malfeasance, misfeasance, or nonfeasance in office or of any officer or employee**, a copy of the report, signed and verified, shall be placed by the state examiner with the attorney general and the inspector general. **The attorney general shall diligently institute and prosecute civil proceedings against the persons or entities charged in such report**, or upon the officer's or employee's official bond, or both, **and against any other proper person that will secure to the state or to the proper municipality the recovery of any funds misappropriated, diverted, or unaccounted for.**

*Id.* (emphases added). The report "shall be taken and received in any and all courts of this state as prima facie evidence of the facts stated and contained" therein. I.C. § 5-11-6-1(h).

[34] Pfister and Sopko claim, as the trial court found, that the Public School Manual is a "best practices" guide that is not "legally binding." Appellees' Br. p. 24. But, as just explained, the SBOA is tasked with establishing uniform compliance guidelines that audited entities "must observe." I.C. § 5-11-1-24(a). The Public School Manual contains those guidelines. In addition, "[a]ll public officers and responsible officers of audited entities shall adopt and use" the SBOA's books, forms, records, and systems of accounting and reporting. I.C. §

5-11-1-21(a). It is clear that the Public School Manual is more than a best-practices guide and that the School Town, including its officers, must follow the guidelines contained therein.

[35] Pfister and Sopko then argue that violations of the Public School Manual do not, by themselves, "establish actionable offenses." Appellees' Br. p. 25. Instead, they claim, the State was required to bring this case "pursuant to a valid, underlying cause of action," such as breach of contract, theft, or conversion. *Id.* at 38; *see also* Appellees' Sur-Reply Br. p. 4 ("There is no standalone cause of action for 'nonfeasance,' nor 'misfeasance,' nor 'malfeasance' in Indiana and the statute at issue here does not create them."); Oral Arg. at 34:18-34:30 (claiming that Section 5-11-5-1(a) requires violation of a statute or an underlying crime, tort, or breach of contract).

[36] We disagree with Pfister and Sopko that an underlying cause of action is needed. In the words of the State, Section 5-11-5-1(a) "*is* the cause of action." Appellant's Reply Br. p. 7. Such cause of action is for the recovery of funds misappropriated, diverted, or unaccounted for as a result of malfeasance, misfeasance, or nonfeasance. *See Robertson*, 141 N.E.3d at 1226 (noting that the Attorney General brought a "claim[] to recover public funds" under Section 5-11-5-1(a)). Here, the State alleged in the complaint that the attached Special Investigation Report disclosed "malfeasance, misfeasance, and/or nonfeasance" and that public funds had been misappropriated, diverted, or unaccounted for. Appellant's App. Vol. 2 p. 73. The State has set forth a valid

claim to recover funds under Section 5-11-5-1(a). Accordingly, the trial court erred by granting summary judgment to Pfister and Sopko.

[37] The trial court gave two alternative grounds for entering summary judgment to Pfister and Sopko. First, the court found that Section 5-11-5-1 was "undoubtedly unconstitutionally vague" as applied to Pfister and Sopko because Section 5-11-5-1 is directed to "State agencies" and not "employees." Appellant's App. Vol. 2 pp. 64-65. We disagree. Section 5-11-5-1(a) specifically states that the Attorney General can bring suit against "**the persons or entities charged in such report**, or upon the officer's or employee's official bond, or both, and **against any other proper person** that will secure to the state or to the proper municipality the recovery of any funds misappropriated, diverted, or unaccounted for." (Emphases added). And second, the court found that the State could not recover amounts before March 2002 due to record-keeping issues and staff changes. Section 5-11-6-1(h), however, provides that the SBOA's report "shall be taken and received in any and all courts of this state as prima facie evidence of the facts stated and contained" therein. Because the Special Investigation Report details overpayments in some of the categories beginning as early as 1999, it is enough to survive summary judgment.[18] For the

_____

[18] We note, as explained above, that the trial court didn't reach the merits of whether the State was entitled to summary judgment on the issue of the alleged overpayments to Pfister and Sopko for cash bonuses, investment allotments, salaries and stipends, and community-relations activities as well as audit costs since it found that the State had "not set forth any actionable ground for recovery of the amounts, regardless." Appellant's App. Vol. 2 p. 69. Because we are reversing the trial court's grant of summary judgment for Pfister and Sopko and remanding this case to the trial court for trial, this issue can be addressed then.

above reasons, the trial court erred in granting summary judgment to Pfister and Sopko on the basis that Section 5-11-5-1(a) does not authorize the action here.

## II. The language of Paragraph 10 is unambiguous and does not allow for compounding of percentages

[38] The State next contends that the trial court erred in granting partial summary judgment to Pfister and Sopko on the issue of overpayments to their annuities. As explained above, in July 2023, the trial court entered summary judgment on this issue for Pfister and Sopko on the ground that Paragraph 10 of the contracts was "subject to more than one interpretation" as to whether the percentages compounded from year to year and therefore was "ambiguous" on this point:

> They did not "deviate" from the "plain reading" of Paragraph 10 of their contracts, because there is no facial "plain reading" of the contracts. On that discrete issue, summary judgment is granted in Defendants' favor.

Appellant's App. Vol. 13 pp. 214, 216-17.

[39] The goal of contract interpretation is to determine and implement the parties' intent when they entered the contract. *Wohlt v. Wohlt*, 245 N.E.3d 611, 616 (Ind. 2024). "And to do that, courts start with the language of the parties' agreement." *Id.* If the contract's terms are unambiguous, then they are conclusive of the parties' intent, and courts give the contract its plain meaning. *Id.* "Thus, when reviewing an unambiguous written contract, courts look only to that document, staying within its four corners." *Id.*

[40] "On the other hand, if a contract's terms are ambiguous, inconsistent, or uncertain, its interpretation is no longer a question of law but one of fact." *Id.* "In that case, the trier-of-fact must determine the facts required to construe the contract." *Id.* "And to do that, the factfinder must look outside the contract's four corners to parol (or extrinsic) evidence." *Id.* A contract is not ambiguous simply because the parties disagree about the proper interpretation of its terms. *Id.* "Instead, for an ambiguity to exist, the contract must be subject to more than one reasonable interpretation." *Id.*

[41] The State argues that the language in Paragraph 10 of the contracts is unambiguous and doesn't allow for compounding. Again, the language in Pfister's final contracts provides:

> The School Corporation shall pay the Superintendent's annual contribution to the Indiana State Teachers Retirement Fund, **plus each year an additional 4% toward an annuity of his choice.**

S-J Ex. 5 (emphasis added). And the language in Sopko's final contracts provides:

> The School Corporation shall pay the Assistant Superintendent's annual contribution to the Indiana State Teachers' Retirement Fund, **plus each year an additional 3% toward an annuity of his choice.**

S-J Ex. 17 (emphasis added). According to the State, the language is unambiguous that

the School Town of Munster was to pay Pfister and Sopko's yearly contributions to the State Teacher's Retirement Fund and an additional 3% [Sopko] or 4% [Pfister] annuity bonus on top of th[e] yearly contributions for every year of the three-year contract. This provision is not ambiguous because Pfister and Sopko's interpretation, which compounded the yearly payments to more than 30% of their base salary, is not reasonable.

Appellant's Br. p. 27; *see also* Appellant's Reply Br. p. 13 ("The annuity provision is unambiguous and provides a static yearly annuity bonus[.]").

[42] We agree with the State that the Paragraph 10 language is clear that each year—in addition to the annual contributions to their TRFs—Pfister was supposed to get 4% of his salary and Sopko was supposed to get 3% of his salary toward their annuities, with no compounding from year to year.[19] Because we find that the language of Paragraph 10 is unambiguous on this point, we stay within the four corners of the contracts and do not consider any extrinsic evidence, such as the interrogatory responses and emails relied on by Pfister and Sopko. *See Wohlt*, 245 N.E.3d at 616.

[43] Pfister and Sopko also argue that even if the provision doesn't allow compounding, the parties amended the Paragraph 10 language "by their

---

[19] The State notes that "[f]rom the beginning of this case all parties have agreed that the percentage was calculated from [Pfister's and Sopko's] salaries." Appellant's Reply Br. p. 15. Pfister and Sopko, however, claim that "[t]here is no indication that the 4 percent is intended to mean 4 percent of the Defendants' salary, their salary including bonuses, their salary minus, say, certain fringe benefits." Appellees' Br. p. 37. Whether the relevant number is the base salary or some other amount does not make Paragraph 10 ambiguous as to whether compounding is allowed. The parties can argue what amount the percentages apply to at trial.

actions." Appellees' Br. p. 39. They claim that "it has long been undisputed that the Defendants and the School Town Board enforced the provision a specific way, year after year." *Id.*; *see also id.* at 40 (citing the "voluntary payment doctrine"). But as the State highlights, the contracts themselves provide that any modifications must be in writing. *See, e.g.*, S-J Ex. 1. In any event, as the State emphasizes, whether a contract has been modified is a question of fact to be determined by the fact finder and is therefore not a proper basis upon which to grant summary judgment to Pfister and Sopko. *See* Appellant's Reply Br. p. 17.

[44] The trial court erred in entering partial summary judgment for Pfister and Sopko on the ground that Paragraph 10 was "subject to more than one interpretation" as to whether the percentages compounded from year to year. We therefore reverse the trial court's grant of summary judgment to Pfister and Sopko. In accordance with the State's request and its argument that there are "still questions of fact left for the fact-finder to decide," such as whether malfeasance, misfeasance, or nonfeasance has been committed and whether the funds were misappropriated, diverted, or unaccounted for, *see* Oral Arg. at 25:05-25:29, we remand this case to the trial court for trial.

## III. We affirm in part and reverse in part the grant of summary judgment to Travelers and Ohio Farmers

[45] Finally, the State contends that we should reverse the trial court's entry of summary judgment for Travelers and Ohio Farmers. But as Travelers and Ohio Farmers point out in their Notice of Non-Participation, the State "does not challenge or address any of the policy-specific arguments

raised by Ohio Farmers and Travelers and resolved by the trial court's two separate Summary Judgment Orders." No. 24S-PL-310 (Ind. Jan. 13, 2025). Therefore, while we reverse the trial court's full grant of summary judgment for Travelers and Ohio Farmers for the same reasons that we are reversing the grant of summary judgment for Pfister and Sopko, we leave intact the trial court's grant of partial summary judgment on grounds that Travelers' and Ohio Farmers' liability is limited based on the language of the policies and bonds.

[46] Affirmed in part and reversed and remanded in part.

Bailey, J., and DeBoer, J., concur.

ATTORNEYS FOR APPELLANT

Theodore E. Rokita
Attorney General of Indiana

Benjamin M. L. Jones
Section Chief, Civil Appeals

Samuel Dayton
Supervising Deputy Attorney General
Indianapolis, Indiana

ATTORNEY FOR APPELLEES WILLIAM J. PFISTER AND ESTATE OF RICHARD A. SOPKO

Jeff Carroll
Koransky Bouwer & Poracky, P.C.
Dyer, Indiana